# REPORTS.

## GRAFTON,
### JULY TERM, A. D. 1840.

### BEDEL *vs.* LOOMIS & a.

Where the legislature of the state has asserted a right of jurisdiction within certain limits, it is not competent for this court to examine into the matter, and circumscribe the jurisdiction, by a decision that the boundaries of the state do not extend so far.

If an individual has made a purchase of land from Indians, prohibited by law, for which he might have been punished; and which conveyed no title, so that he might have been removed as an intruder; still, if he enters into possession of it, and is suffered to remain, he may maintain that possession against persons who have no right to the land. And his quitclaim deed, subsequently made, with covenants of warranty against persons claiming under him, will furnish a sufficient consideration for a promise to pay a sum of money, if the sale is without fraud, and with a knowledge of the circumstances.

It is not sufficient, to avoid a contract of sale, that the price agreed to be paid appears to be excessive. Gross inadequacy of value may be a strong circumstance to show fraud; but if there is no fraud or imposition, the parties have the right to fix the measure of value, and are bound by it.

ASSUMPSIT. The first count alleged that the defendants, on the 11th of July, 1835, in consideration of a deed executed to them by the plaintiff, of twelve twenty-fifth parts of the Indian Stream Territory, promised the plaintiff to pay him the sum of $4·000 on or before the 10th of July, 1836; or in case said land should not be disposed of by said 10th day of July, 1836, to re-deed to the plaintiff the said land, on demand. And the plaintiff averred that he was

ready to receive said deed, or said money; and that on the 19th of July, 1836, he requested payment of said money, or a re-conveyance of said land; but the defendants neglected and refused to perform either of said conditions.

There was another count, like the first, except that it alleged that the defendants promised to pay the plaintiffs $4·000 on or before the 10th of July, 1836; or, in case the land had not been disposed of before that time, to re-convey the same, with an averment that the defendants did dispose of said land prior to said 10th of July. Yet the defendants had not paid said sum.

The defendants pleaded the general issue.

To support the declaration, the plaintiff offered a contract, signed by the defendants, as follows, viz.: "We the subscribers hereby agree and bind ourselves to pay to Moody Bedel the full sum of four thousand dollars, for the twelve twenty-fifth parts of the Indian Stream Territory, this day deeded to John Wilson, Benjamin Stephenson and Lewis Loomis, on or before the 10th day of July, 1836; or in case the said title of land is not disposed of by the said 10th day of July, 1836, we promise to re-deed to said Bedel all the right, title and interest which he, the said Bedel, conveyed to us in the deed above mentioned, on demand. July 11, 1835." He also proved a demand on said Wilson, and on Stephenson, two of the defendants, to pay said money, or re-deed said land, which demand was made on the 19th of July, 1836.

It appeared in evidence that the plaintiff entered upon the Indian Stream Territory, so called, lying north of the forty-fifth degree of north latitude, in 1811, and lived there some ten or twelve years. He also lived there within some few years past, but had left prior to 1835, and removed with his family to Bath, in the county of Grafton, where he has lived ever since.

It appeared further, that Loomis, on the 20th of Oct. 1835, by deed of release and quitclaim, conveyed to one Lorenzo H.

M. Cochran " three undivided twenty-fifth parts or shares of the tract of land above the forty-fifth parallel of north latitude, commonly known as the Indian Stream Territory, or King Philip's Grant, supposed to contain twelve thousand acres of land to a share." The deed recited that said three twenty-fifth parts were conveyed by a deed from the plaintiff, by which the plaintiff relinquished all his right, title and interest to the Indian Stream Territory, or King Philip's Grant, to the defendants, the lands occupied and improved by actual settlers excepted; and set forth that said three twenty-fifth parts of the whole territory, or tract, were equal to and the same as three twelfth parts of the claim of the plaintiff and his associates. This deed contained the following clause, viz. : " To have and to hold the above released premises, to him, the said Cochran, his heirs and assigns, to his use and behoof forever ; so that neither I, the said Loomis, nor my heirs, or any other person or persons claiming by, from or under me, them, or in the name, right or stead of me, or them, shall or will, by any way or means, have, claim or demand any right or title to the above released premises, or to any part or parcel thereof forever."

On the 24th of December, 1835, Wilson and Stephenson, by their quitclaim deed, conveyed to Loomis all their right and title to three twenty-fifth parts of said tract, being a part of the tract deeded to them and Loomis, by the plaintiff, with a reference to the deed of the plaintiff for a more particular description—" meaning to convey to said Loomis all the interest in said tract which we acquired by virtue of said deed, Bedel to us, and no more ; reserving, however, all the lands occupied by settlers on said tract, who are to be quieted in their several improvements and possessions." This deed contained a covenant that the grantors, from and after its execution, would have and claim no right in the premises.

The defendants offered in evidence the deed from the plaintiff to them, before mentioned, dated July 11, 1835, whereby the plaintiff remised, released and forever quit-

claimed to them, and their heirs and assigns, "all my right, title, interest, claim and demand to twelve twenty-fifths of all that tract of land lying north of latitude forty-five, on the head waters of Connecticut river, embracing lake Connecticut, lake Charles, and the pond above, which was deeded to me by the St. Francis Indians, and confirmed to me by the claimants under King Philip, bearing date the 11th of June, 1830, bounded as follows, to wit.: beginning on the highlands dividing the waters of the St. Lawrence from that of the Connecticut, at the most northwesterly head of said Connecticut; thence southerly down said river to latitude forty-five; thence east on said latitude forty-five, to the line dividing the state of Maine from that of New-Hampshire; thence north, on said line, to the highlands dividing the waters of the St. Lawrence from that of said Connecticut river; thence westerly on said highlands, to the first mentioned bound; containing by estimation three hundred thousand acres, be the same more or less;—reserving, however, all the land occupied and possessed by settlers on said land, who are to be quieted in their several improvements and possessions." This deed contained a covenant of warranty against the lawful claims of all persons claiming by, from or under the grantor.

The defendants also put into the case a deed, dated October 27, 1798, from sundry persons "of the tribe or nation of the St. Francis, or aboriginal Indians," whereby they, for the consideration of thirty-one hundred dollars, granted, bargained and sold, to the plaintiff and two other persons, and their heirs and assigns forever, a tract or parcel of land, "bounded as follows, viz.: beginning at the mouth of the Ammonoosuck river, where it empties into the Connecticut river, in Haverhill, in the county of Grafton, and state of New-Hampshire; from thence on a straight line eastwardly, southward of the White mountains, to Great Ossipee river, where it crosses the boundary line between the said state of New-Hampshire and Massachusetts Bay; from thence north-

Bedel *v.* Loomis.

westwardly, on the boundary line between the two states aforesaid, on the same course, to the boundary line between the United States and the government of Great Britain, as established by the treaty between the king of Great Britain and the United States of America ; from thence, on said last mentioned line, to Connecticut river ; from thence down said river, to the first mentioned bound ; except one town of twelve miles square, already sold and deeded to Capt. Thomas." And the grantors, for themselves, their heirs, and " successors in office," covenanted with the grantees, their heirs and assigns, that the nation or tribe to which they belonged as aforesaid, were the lawful original owners and possessors of the same ; and that they, as chiefs, captains, and representatives of the nation, or tribe, had full power to sell and dispose of the same, in manner aforesaid, and bound themselves, their heirs, executors, administrators and assigns, as well as their successors in office, to warrant and forever defend the same to the grantees, their heirs and assigns, against the lawful claims of any person whomsoever.

This deed was recorded in " Bedel's Grant," and also in the county of Coos.

On this testimony the defendants contended that the plaintiff had no title, and could convey nothing—the pretended title from the Indians of the St. Francis tribe being obtained in violation of the act of the United States, making it a misdemeanor in any individual, not employed under the authority of the United States, to purchase lands of the Indians, directly or indirectly.

The plaintiff contended that, having entered into possession, the sale of his right of possession was a good consideration for the defendants' contract.

A verdict was taken for the plaintiff, subject to be set aside and a judgment rendered for the defendants, if the court should so direct.

*Bell,* for the defendants, argued that the purchase by the

plaintiff, of the Indians, in 1798, was illegal, being prohibited by an act of Congress, passed prior to that time—that it was, therefore, illegal for him to sell, and that the act upon which the plaintiff founded his consideration being illegal, no valid contract could arise—that the possession of the plaintiff, originating in an act against law, could not furnish the foundation of a valid contract—and that whatever possession the plaintiff might have had, it was abandoned long before he made his deed, so that at the time of the contract he had no possession, and his deed therefore gave no color of title to the defendants.

*Bartlett, Goodall & Woods*, for the plaintiff, contended that the act of Congress of 1796, prohibiting the purchase of lands from Indians, applied only to purchases from Indians residing within the limits of the United States—that it was only of such Indians that the general government assumed to be guardians—that the St. Francis tribe in fact lived in Canada—that the act had no operation to prohibit purchases from Indians, where the lands lay within the limits of any state ; and that these lands were within the limits of New-Hampshire, the state having asserted jurisdiction over all lands lying south of Canada, between Maine and Vermont, and a right to the soil—that if the plaintiff had no title, there being no fraud or deception, the defence could not be sustained, as the defendants might well purchase the plaintiff's right and claim, whatever it was—that the plaintiff was in possession, which furnished a good consideration —that this possession was not vitiated by taking a bad conveyance—that the plaintiff was not prohibited from selling any rights he might have—and that he had others besides those derived from the Indians.

*Bell*, in reply, contended that the grants of the state had never extended into this territory—that on the treaty with Great Britain, in 1783, it became part of the territory of the

United States, and was so when the deed was made to the plaintiff—that if within the limits of the state, the constitution of the United States empowered Congress to pass the act, and that lands within the states were included in it—that it did not appear that the St. Francis tribe lived out of the United States, and the legal presumption was that they were on the land they attempted to convey, as their title was only by occupancy, and the covenants in the deed to the plaintiff stated them to be in possession—that it was of no importance whether they were within the limits of the United States, or not, as the lands were so, and the act operated upon the lands—that if they were not in the occupation of the lands, nothing could pass by their deed—and that, in either view of the case, the plaintiff had nothing to convey, and conveyed nothing to the defendants.

PARKER, C. J. One question which has been made in this case, is whether the land described in the deed from the plaintiff was at the time within the limits of this state. Perhaps the limits of the earlier grants might not embrace the territory in question, and the provincial authorities could not have exercised any jurisdiction over it; but upon the revolution, and the treaty which followed it, defining the boundary line between the Canadas and the states, this territory was supposed, and must be deemed by us, to have fallen within the limits of the state of New-Hampshire, as the United States have never claimed title to any tract of land lying between this state and Canada; and the state itself, after much investigation upon the subject, asserted a title and jurisdiction in 1820, by a resolution directing the attorney-general to proceed against intruders; and again in 1824, by an express declaratory act. There has been no pretence of any grant by which the state acquired a title subsequent to the separation from Great Britain; and these acts must be taken and deemed to be an assertion of title, and a right of jurisdiction, from that period; and the question, therefore, wheth-

er the land is within the limits of the state, is here no longer open. We cannot undertake to limit the jurisdiction which the government has thus asserted, by a decision that the boundaries of the state do not extend so far.

The provincial legislature of New-Hampshire, as early as 1719, passed an act to prevent, and make void, purchases from the Indians without the license or approbation of the general assembly. Upon the revision of the laws, in 1792, this was repealed, and no provision appears to have been substituted, probably because, upon the organization of the government of the United States, that subject was more particularly within the control of the general government. As early as 1790, Congress passed an act providing that no sale of lands made by Indians, or any nation of Indians, within the United States, should be valid unless made and executed at some public treaty, held under the authority of the United States. This act expired by its own limitation in March, 1793, but another act was then passed, containing a similar prohibition, and making it a misdemeanor, punishable by fine and imprisonment, for any person, not employed by the United States, to treat for a purchase in such case. Divers acts have been passed from time to time, since that period.

It has been controverted in this case whether the act of Congress applies to lands within the limits of the original thirteen states; and whether it applies to purchases from Indians residing without the jurisdiction of the United States. These matters have no bearing upon this case, except as they relate to the question, whether the supposed purchase by the plaintiff, from the St. Francis Indians, was or was not prohibited by the laws of the United States as a misdemeanor. But in the view we have taken of the case, this has become immaterial. If the statute then in force, prohibiting purchases from the Indian tribes, was not applicable to that purchase, then the act of the plaintiff, in taking his deed, might have been merely nugatory. And if, on the other hand, such purchase was a misdemeanor, subjecting the

plaintiff to punishment, and making the deed a nullity, and not even color of title ; still we are of opinion that a possession, taken after such purchase, would be no worse than a possession taken without any purchase ; that it would be an intrusion upon lands, the title of which was in the state, subject to the Indian right of occupancy ; and that for such intrusion the party would be liable to answer to the state : but such possession would so far avail against other persons, that no one having no better right could eject the party from the possession thus acquired. For the act of unlawfully making the purchase, he would be liable to be punished ; the contract would be void ; the possession taken afterwards would be an unlawful intrusion, upon which the government might proceed to remove him, but it would be nothing more than that. It would not authorize others to treat him as an outlaw, or expel him by force. The possession thus acquired he might hold, except against the Indians, or the state, or the grantees of the latter. And such possession, if it was not abandoned, might as well be the subject of sale and transfer, as any other possession acquired by intrusion, or trespass. If any one saw fit to purchase from such occupant, the deed would convey a seizin against all persons but those having better title, (to wit., the Indians and the state) the same as in any other case of a conveyance by a disseizor. Such contract would be no more tainted with the prior illegal proceeding, than the latter would be tainted or affected by the disseizin.

If, then, the plaintiff had not even color of title by his deed, but had entered and been permitted to remain, and the defendants, knowing all the facts of the case, saw fit to purchase his right, such as it was, without any deception, or fraud, or misconduct of the plaintiff in the making of this latter contract—if, for instance, they took by fair bargain a deed of all his right, and title, hoping that they might thereby obtain a confirmation from the state, as had been the case in some instances, previously, in relation to the possessions

of actual settlers—there is no sound reason why they should now turn round, and attempt to avoid the performance of that contract, because the plaintiff had at a previous time received a deed from certain Indians, contrary to law. If his possession may be supposed to have been taken in consequence of that, it is not so connected with it that the defendants can thereby annul their subsequent contract. This latter contract is not for the conveyance of an Indian title, but of the right of the plaintiff to the land, such as it existed at the time. If fairly made, and with no sinister intent, it is sufficient to pass a right to occupy so much of the land as the plaintiff possessed, and did not abandon, as against any person who cannot show a better title. 9 *N.H. Rep.* 168, *Gibson* vs. *Bailey ; Ditto* 400, *Straw* vs. *Jones.* And the covenant in the deed, against all persons claiming by virtue of a title from the plaintiff, may furnish, in such case, a good foundation for the recovery of damages against the plaintiff, if other persons are in possession by virtue of any prior deed from him. Under such circumstances we cannot, as the case stands, hold that this contract was without consideration. The title which the plaintiff quitclaimed may have been of very little value. It may have been a mere possessory title, without any valid evidence of conveyance ; and the possession upon which it is founded may have been abandoned in 1820 or 1821, from an apprehension that the state was about to proceed against the plaintiff as an intruder. The possession may have been resumed, at a later period, from the hope that some person might be induced to purchase the right, rather than from a belief that the state would confirm the possession ; and it may not have been kept up by an actual residence upon the territory, at the time of the sale to the defendants. Still, if all this was known to the defendants, and they saw fit to contract to pay the plaintiff $4·000 for a possession which might avail, as to some portion of the tract, against all persons but those who might claim under a title from the state, (the plaintiff

Bedel *v.* Loomis.

having covenanted against all persons claiming under him) we discover no sound principle upon which we can hold this contract illegal, and therefore void, or inoperative, for the want of a consideration; notwithstanding we may be of opinion that the amount thus contracted to be paid exceeded the real value of the subject matter of the sale. Gross inadequacy of consideration may be a strong circumstance to show fraud, and there may be relief against an unconscientious bargain, in equity. 2 *Ves. Sen.* 516, *How* vs. *Weldon;* 3 *Ves. & Bea.* 117, *Bowes* vs. *Heaps.* But the parties have the right, and power, to fix the measure of value; and between parties standing on equal ground, in the absence of any attempt at fraud or imposition, or any combination for that purpose, mere inadequacy of consideration is not sufficient to avoid a contract, even in equity. 9 *Ves.* 246, *Coles* vs. *Trecothick;* 3 *Ves. & Bea.* 188, *Western* vs. *Russell;* 1 *Swanston* 329, *Prebble* vs. *Boghurst;* 2 *Johns. Ch. Rep.* 23, *Osgood* vs. *Franklin.*

*Judgment for the plaintiff.*

